**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-mc-00051-MSK-KLM    )
    )
UNITED STATES OF AMERICA,    )
    )
        Petitioner,    )
    )
v.    )
    )
RAJARAM K. MATKARI,    )
    )
        Respondent.    )

---

**RAJARAM K. MATKARI'S WRITTEN RESPONSE TO ORDER TO SHOW CAUSE
REGARDING GOVERNMENT'S PETITION TO ENFORCE IRS SUMMONS**

---

Respondent Rajaram K. Matkari (Mr. Matkari), by and through his attorney,

Michael F. Arvin, hereby submits this Response to the Court's Order to Show Cause

regarding the government's Petition to Enforce IRS Summons as to numerous financial

records alleged to be held by Mr. Matkari.

## I. INTRODUCTION

On February 27, 2018, the Internal Revenue Service ("IRS") served upon Mr.

Matkari an IRS Summons (the "Summons") demanding that he appear on March 12,

2018, to testify and produce records for the tax years 2011 through the present. The

records demanded include ". . .any and all records required to be maintained pursuant

to 31 C.F.R. § 1010.420 (§103.32 prior to March 1, 2011) relating to foreign financial accounts that you had/have a financial interest in. . ." and exhaustive information regarding all such accounts. [Doc. # 1-2, Attachment to Exh. 1 thereof].

On March 23, 2018, the United States, on behalf of the IRS, filed a Petition to Enforce IRS Summons, supported by the Declaration of IRS Special Enforcement Group (SEP) Revenue Agent Heather A. Styron. The Petition and Declaration allege that Mr. Matkari did not comply with the Summons. According to the government, it seeks records of foreign and domestic financial accounts to ". . .determine Mr. Matkari's income tax liabilities for the taxable years 2011 through 2014", and so that it can determine whether ". . .Mr. Matkari is liable for any penalties stemming from his failure to properly file information returns with respect to his foreign bank account activity during the taxable years 2011 through 2014." The government states that Mr. Matkari's tax returns for those years contain incomplete disclosures regarding foreign financial accounts, with the said disclosures accompanied by an assertion of the Fifth Amendment privilege against self-incrimination.

The Summons targets records required to be maintained pursuant to 31 C.F.R. § 1010.420, promulgated under the Currency and Foreign Transaction Reporting Act of 1970, 31 U.S.C. § 1051 *et seq.* (the "Bank Secrecy Act" or "BSA").  Under that provision, each person having "a financial interest in or signature or other authority over" a foreign financial account is required to maintain records of that account for five years and to keep those records available "at all times . . . for inspection as authorized by law."  *Id.*  The records are required to "contain the name in which each

such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period." *Id.*

By requiring Mr. Matkari to produce to the government records of foreign financial accounts, the Summons and 31 C.F.R. § 1010.420 implicate Mr. Matkari's Fifth Amendment act of production privilege. While courts in various other circuits have held that the "required records exception" to the privilege applies to such records, the Tenth Circuit has not addressed this issue. The application of the "required records exception" to fact patterns such as the one presented here is an attempt to upend, recast and sometimes ignore altogether the Supreme Court's Fifth Amendment jurisprudence and precedent.

## II. ARGUMENT

### To compel compliance with the IRS Summons would violate Mr. Matkari's Fifth Amendment act of production privilege.

The Constitutional guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. Amend. V, reflects "a judgment . . . that the [government] should [not] be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." *Ullman v. United States,* 350 U.S. 422, 427 (1956). The act of production privilege has been a well-recognized facet of the Fifth Amendment's privilege against self-incrimination since the Supreme Court's decisions in *Fisher v. United States,* 425 U.S. 391, 410 (1976)

('"The act of producing evidence in response to a subpoena [to a taxpayer] . . . has communicative aspects of its own, wholly aside from the contents of the papers produced."); and *United States v. Doe,* 465 U.S. 605, 612 (1984) ("A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect.").  The act of production privilege recognizes that, while the contents of records generally are not privileged because the creation of the records was not compelled, the forced act of *producing* the records may be testimonial and incriminating, and is therefore protected by the Fifth Amendment.

As the Tenth Circuit has articulated, the act of production inquiry focuses on "proof of the document's existence, possession and authenticity."  *In re Foster*, 188 F.3d 1259, 1269-70 (10th Cir. 1999).  The act of producing documents in response to a subpoena communicates at least four different assertions: (1) that responsive documents exist; (2) that the responsive documents are in the possession and control of the subpoenaed party; (3) that the responsive documents are authentic; and (4) that the party producing the documents believes that the documents are responsive to the subpoena. *United States v. Hubbell*, 167 F.3d 552, 567-68 (D.C. Cir. 1999), *aff'd*, 530 U.S. 27 (2000); s*ee also In re Foster*, 188 F.3d at 1270 ("Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by [their owner or the owner's agent]. It also would indicate the [owner or agent]'s belief that the papers are those described in the subpoena . . . .") (brackets in original, quoting *Fisher v. United States*, 425 U.S. 391, 410 (1976)).

The Supreme Court in *Hubbell* confirmed that the Fifth Amendment affords the same protection to the testimonial aspects of a person's act of producing documents as it does to any other compelled testimony:

> [W]e have no doubt that the constitutional privilege against self-incrimination protects the target of a grand jury investigation from being compelled to answer questions designed to elicit information about the existence of sources of potentially incriminating evidence. *That constitutional privilege has the same application to the testimonial aspect of a response to a subpoena seeking discovery of those sources.*

530 U.S. 27, 43 (2000) (emphasis added).

This is precisely the situation here. The government seeks to have Mr. Matkari "testify" in response to the Summons, both by personally appearing before the assigned IRS Revenue Agent and by either producing records of foreign bank accounts, or by acknowledging a failure to have maintained such records. The government believes that Mr. Matkari has or had an interest in foreign accounts, and failed to make the required disclosures under 31 C.F.R. § 1010.350. Such a failure, if it occurred without justification, constitutes a criminal violation. *See* 31 U.S.C. § 5322.

If Mr. Matkari produces documents responsive to the Summons, he will be telling the government: (1) that foreign account records pertaining to him exist; (2) that he possesses or has some form of control over those documents; (3) that the documents are authentic; and (4) that he believes that these documents are responsive to the Summons, *i.e.*, that he is a person who is subject to the regulation cited in the Summons, 31 C.F.R. § 1010.420, because he has or had an interest in a foreign account or accounts. The government may be able to use each of these testimonial

assertions as an outright admission, or at least as a link in the chain of evidence,[1] to prosecute Mr. Matkari, under 31 U.S.C. § 5322, for willfully failing to report a foreign bank account as required by 31 C.F.R. § 1010.350. If Mr. Matkari responds to the Summons by stating that he has no records, that assertion may be used against him, as well, either: (1) to prosecute him, also under 31 U.S.C. § 5322, for the willful failure to retain foreign account records as required by 31 C.F.R. § 1010.420; and/or (2) to argue consciousness of guilt (*i.e.,* that Respondent knew it was unlawful to have an undisclosed foreign account, so he purposely did not retain any records).

What the government seeks through the Summons is the functional equivalent of calling Mr. Matkari to testify as to whether or not he has or had a foreign bank account, and whether or not he knew to retain records relating to that account. Any response to the Summons is thus clearly testimonial at its core and is protected by the act of production privilege as articulated by *Hubbell*.

## I.      The required records exception to the act of production privilege is inapplicable.

The "required records exception" should not be interpreted to overcome the Fifth Amendment act of production privilege in this context. Under the required records

---

[1]      "The privilege afforded [by the Fifth Amendment] not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."  *Hoffman v. United States*, 341 U.S. 479, 486 (1951).

exception, production of records that would otherwise fall within the act of production privilege may be required if: (1) the purpose of the statutory scheme that requires the records to be maintained is essentially regulatory and civil, rather than prosecutorial; (2) the regulated party would ordinarily keep the kind of records sought by the government, *and* (3) the records have assumed public aspects rendering them analogous to public documents. *Grosso v. United States,* 390 U.S. 62, 67-68 (1968); *see also Rajah v. Mukasey*, 544 F.3d 427, 442 (2nd Cir. 2008) (there must be a "valid *civil* regulatory scheme" for the *Grosso* test to be met (emphasis added)). While several circuit courts have held that records required to be kept under the BSA are subject to the required records exception, *see United States v. Chen*, 815 F.3d 72, 78 (1st Cir. 2016) (agreeing with "seven of our sister circuits" as to the application of the required records exception in holding that taxpayer must comply with an IRS summons for BSA records); *United States v. Chabot*, 793 F.3d 338, 345 (3rd Cir. 2015) ("we join these circuits in applying the required records exception to" records required by 31 C.F.R. § 1010.420), the Tenth Circuit has not addressed this issue. If correctly interpreted by the Tenth Circuit or the Supreme Court, either court would conclude that the required records exception does not apply here.

> A. *The required records exception stemmed from emergency Congressional action during wartime and has since been overextended by the government.*

The required records doctrine, which has its roots in *Shapiro v. United States,* 335 U.S. 1 ( 1948), was formulated against a background of exigent wartime circumstances that do not underlie the Bank Secrecy Act and regulations promulgated thereunder. Hearings on the statute and regulations at issue in *Shapiro* specifically pointed out that

"It should not be forgotten that the statute to be administered is an '*emergency statute*.'"
*Id.* at 12 (citation omitted) (emphasis added).[2]

In *Shapiro,* the petitioner was licensed by the government to sell fruits and
vegetables to the public under emergency wartime regulations governing commodities
pricing in order to prevent inflation and price gouging immediately following the
outbreak of World War II. As a licensee, Shapiro was required to maintain "invoices,
sales tickets, cash receipts or other evidences of sale or delivery." *Id.* at *5* n.3. The
*Shapiro* Court held that Shapiro's Fifth Amendment privilege was not violated by
requiring him to produce these routinely-maintained kinds of records in the context of
this heavily-regulated wartime program. Because Shapiro was engaged in a commercial
activity with the public; because he could engage in that activity "solely by virtue of the
license granted to him under the statute," *id.* at 35, which license obligated him to
maintain records relating to that activity; and because the activity was regulated as a
result of the exigencies of World War II, the records had assumed the character of
public records, which are not protected by the Fifth Amendment from production or
disclosure. The linchpin of the Court's opinion was that the records had "public aspects,"
*id.* at 34, *not* simply because they were required to be maintained by a statute
enacted by Congress or by a regulation promulgated by the Office of Price
Administration, but as a result of the *public* nature of the business activity in which

---

[2]      *See also id.* at 10 (""It is significant to note that the Senate Committee on
Banking and Currency began its consideration of the bill . . . the day after Congress
declared the existence of a state of war between this country and the Imperial
Government of Japan.").

Shapiro was engaged, which activity was licensed and regulated by Congress. In contrast, there is nothing public about the unlicensed activity of owning a private, personal foreign bank account.

The *Shapiro* Court stated that the required records doctrine applies "not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." *Id.* at 17. The *Shapiro* Court was clearly aware of the risk that its holding could be extended too far, noting:

> It may be assumed at the outset that there are limits which the government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself.

335 U.S. at 32.

Justice Alito observed when he served as a Deputy Attorney General:

> The required records doctrine has never recovered from [its] difficult birth. Moreover, the doctrine forces recognition of one of the darker truths about the modem regulatory state. Chief Justice Vinson assumed in *Shapiro* that there were "limits which the Government cannot constitutionally exceed" in requiring the keeping of records for administrative inspection. But expansive interpretations of the Commerce Clause and other grants of governmental power leave vast, perhaps unbounded, areas where recordkeeping may be required. For these and possibly other reasons, the required records rule has been regarded for nearly forty years like an illegitimate war baby.

Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination,* 48 U. Pitt. L. Rev. 27, 72-73 (1986) (footnotes omitted); *see also In re Doe,* 711 F.2d 1186, 1196

(2nd Cir. 1983) (Friendly, J., dissenting) ("[t]he required records exception . . . has been problematic from the outset").

It is also important to sort events that shape the law by chronology. The act of production privilege was not at issue when the Court decided *Shapiro*; the act of production privilege was first articulated by the Supreme Court twenty-eight years later in *Fisher v. United States*, 425 U.S. 391 (1976). The issue in *Shapiro* was simply whether the Fifth Amendment privilege applied to the contents of the "required records" themselves. If the Supreme Court re-examined the issue, it would likely hold that the required records doctrine is unconstitutional in light of the later-established act of production doctrine. The decisions applying the required records exception to BSA records employ the exception as a simplistic means of swallowing and obliterating the act of production privilege whenever a statute requires that records be maintained or information disclosed. But even if it is a generally valid exception, the requirements for application of the exception the Supreme Court set out in *Grosso* are not met here.

**B.  The government cannot satisfy the Grosso test.**

After *Shapiro,* the Supreme Court attempted in *Grosso* to clarify the relation of the required records doctrine to the act of production privilege, and held that the required records doctrine did not apply unless the government could establish all three of the following elements:

> (1)   that the statutory regime giving rise to the record-keeping requirement is "essentially regulatory;"
>
> (2)   that the records at issue are of a kind "which the regulated party has customarily kept;" and
>
> (3)   that the records themselves have assumed "public aspects" which render them analogous to public documents.

390 U.S. at 67-68; *accord Marchetti v. United States,* 390 U.S. 39, 57 (1968). The *Grosso* Court clearly intended to limit expansion of the doctrine established in *Shapiro,* and *none* of the *Grosso* elements are satisfied here. As noted, the Court of Appeals for the Tenth Circuit has not ruled on the issue presented by this case. But the application of the required records exception by other circuits in the context of foreign financial account records under the BSA is an unconstitutional extension of Supreme Court precedent that will ultimately be rejected by the Tenth Circuit or reversed by the Supreme Court.

### 1.   The BSA's record-keeping requirements are not part of an "essentially regulatory" civil regime.

As noted, 31 C.F.R. § 1010.420, the regulation at issue in this case, requires each person having "a financial interest in or signatory authority over" a foreign bank account to maintain records of that account for a period of five years and to keep such records available "at all times . . . for inspection as authorized by law."  This provision operates hand-in-hand with 31 C.F.R. § 1010.350, which requires the filing of an FBAR (acronym for "Foreign Bank Account Report", formerly Form TD 90-22.1, and presently FinCEN 114). Both regulations derive their authority from the BSA. A review of the relevant provisions of the BSA itself, the BSA's legislative history, and the case law interpreting the BSA all leave little doubt that, far from being an "*essentially* regulatory" *civil* regime, the BSA is a statutory and regulatory scheme whose *principal* purpose is to provide law enforcement with evidence of criminal financial transactions that the government previously was unable to obtain because of foreign bank secrecy laws.

Courts have upheld the BSA reporting requirements against facial challenges,

balancing the competing interests of the government in regulating the area in question against the constitutional risk of self-incrimination posed to members of the *general public.* Under this analysis, the courts have determined that the act of reporting does not violate the Fifth Amendment when the reporting is required to be made in an area that is not permeated with criminal statutes or directed at an inherently suspect group. *See e.g., United States v. Dichne*, 612 F.2d 632, 639 (2nd Cir. 1980); *United States v. Des Jardins*, 747 F.2d 499, 508 (9th Cir. 1984).  But the first prong of the *Grosso* test has a different focus – it is focused on the *purpose* of the government inquiry under the statutory scheme at issue, *i.e.,* the government's *intent* in promulgating the statute, and there is no balancing test involved. As *Grosso* states, a court is required to determine if a recordkeeping requirement arises out of an *"essentially* regulatory" statutory regime.

That the two analyses are distinct, and may reach different results, is made clear by *United States v. San Juan,* 405 F. Supp. 686 (D. Vt. 1975), in which the court upheld against facial challenge the currency reporting requirements of the BSA, but nevertheless stated unequivocally that the required records doctrine would *not* apply to records required to be kept by those very same *facially-valid* provisions:

> The Court does not agree with the Government that the defendant's claims can be easily dismissed under the "required records" doctrine of *Shapiro*. That doctrine is applicable only to statutes which are regulatory in nature and to records that are ordinarily kept and have assumed public aspects. None of these essential factors . . . are attributable to the reporting requirements challenged here.

*Id.* at 693-94.[3]  *Cf. Rajah v. Mukasey*, 544 F.3d 427, 442 (2nd Cir. 2008) (applying the two different analyses sequentially – first required records, then facial validity – to regulations requiring aliens from certain countries to produce passports and Forms I-94 in the wake of the 2001 terrorist attacks). Thus, a statute may survive facial Fifth Amendment challenge and yet fail the *Grosso* test in the context of the act of production privilege.

The "essentially regulatory" prong of the *Grosso* test requires not only that the statute or regulation at issue have *some* non-prosecutorial purpose (for instance, determining potential tax liabilities and penalties as is the government's publicly stated goal thus far in this case), but the very *essence* of the legislative regime, viewed as a whole, must serve non-prosecutorial ends. The scheme must be a "valid *civil* regulatory scheme." *Rajah*, 544 F.3d at 442 (emphasis added).  Courts have imposed this requirement to prevent Congress from circumventing the Fifth Amendment act of production privilege simply by enacting record-retention legislation, and then allowing the government to criminally prosecute those who possess the specified records, after requiring their production via summons or subpoena.  *See, e.g., In re Doe,* 711 F.2d at 1191 (in an act of production case, recognizing that there are "constitutional limits on the government's power to compel record keeping which might circumvent the privilege

---

[3]    The court acknowledged that the reporting requirements of the BSA did not arise in an area permeated by criminal statutes. *Id.* at 691-692.  Rather than treating this as the end of the analysis, however, the court went on to hold that this fact could not "mask the underlying *purposes* of Congress in promulgating the foreign reporting requirements of the [BSA] - *purposes which were fundamentally prosecutorial.*"  *Id.* at 693 (emphasis added). These Congressional purposes are what are relevant for analysis of the first prong of the *Grosso* test.

contained in the Fifth Amendment" under the guise of the required records exception); *United States v. Porter,* 711 F.2d 1397, 1405 (7th Cir. 1983) (the mere fact that the government has "formalized its demands in the attire of a statute" does not overcome the Fifth Amendment act of production privilege).

Whatever civil regulatory purpose might be served by a demand for "any and all records required to be maintained pursuant to 31 C.F.R. § 1010.420," the true purpose of a governmental inquiry in the context of the BSA is criminal law enforcement. Unlike many truly regulatory schemes, like that in *Shapiro*, in which a person's employment or license may depend on his or her retaining records, there is no licensing or other employment condition at issue in the BSA. *See e.g. United States v. Porter,* 711 F.2d at 1405 (distinguishing the situation of a taxpayer from *Shapiro* because the petitioner in *Shapiro* was, unlike the taxpayer, required to keep records as a condition of operating his business under a license issued as part of a comprehensive government regulatory scheme). Instead, the BSA was enacted based on a "presumption" by Congress that "secret foreign bank accounts and secret foreign financial institutions are *inevitably* linked to *criminal* activity," *United States v. Hajecate,* 683 F.2d 894, 901 (5th Cir. 1982) (emphasis added), and in response to the "proliferation of white collar crime" committed via secret foreign bank accounts, H.R. Rep. No. 91 -175, 91st Cong., 2d Sess., at 10 (1970), reprinted in 1970 U.S.C.C.A.N. 4394, 4404.

a.   The language and context of the BSA evidence its criminal purpose.

The language and context of the BSA several times emphasize criminal law enforcement and criminal proceedings. The BSA's "declaration of purpose" expressly

states that the statute's aim is "to require certain reports or records where they have a high degree of usefulness in *criminal*, tax, or regulatory investigations or proceedings . . . ."   31 U.S.C. § 5311 (emphasis added). Even if this were all the explanation of the BSA available, the argument that the BSA is therefore essentially regulatory – and recent courts' adoption of that argument – would be unsupportable because it ignores a *primary* purpose of the BSA, i.e. its  usefulness in criminal investigations or proceedings. A statute cannot represent an *essentially* regulatory civil regime when one of its *primary* purposes is to aid in criminal law enforcement. In *Grosso,* the Court noted that, even though the "principal" interest of the United States underlying the wagering statutes at issue "must be assumed" to be the collection of revenue (a civil purpose), because of "Congress's apparent wish that any information obtained as a consequence of the wagering taxes be made available to the prosecuting authorities," the statutory scheme was distinguishable from that of *Shapiro* and was not *essentially* regulatory. 390 U.S. at 68.  Thus, a scheme may have a civil purpose, but yet not be essentially regulatory because it has a prosecutorial purpose as well. The BSA's "declaration of purpose" makes it clear that a prosecutorial purpose is one of the statute's *primary* purposes.

The text of 31 C.F.R. § 1010.420 also reflects the regulations' role in criminal law enforcement. Its requirement that records be maintained for five years coincides with the criminal statute of limitations for willfully failing to file an FBAR, *see* 18 U.S.C. § 3282 (establishing five year statute of limitations for federal offenses), rather than the three-year statute of limitations for civil tax adjustments contained 26 U.S.C. 6501. The regulation also expressly states that, in computing the five-year period for which record-

keeping is required, "there shall be disregarded any period beginning with a date on which the taxpayer is indicted or information instituted on account of the filing of a false or fraudulent federal income tax return or failing to file a federal income tax return, and ending with the date on which final disposition is made of the criminal proceeding." 31 C.F.R. § 1010.420. These overt references to criminal prosecution refute that the BSA's character is "*essentially* regulatory."  In addition, the consequence to an accountholder for willfully not retaining records under the BSA is *criminal prosecution. See* 31 U.S.C. § 5322. Willful disregard of the companion regulation, 31 C.F.R. § 1010.350, which creates the obligation to file an FBAR, is also a *crime. Id.*

Finally, it is very significant that these regulations are administered by FinCEN, the Financial *Crimes* Enforcement Network (emphasis added) of the Department of the Treasury. "The Secretary of the Treasury has delegated to the Director of FinCEN the authority to implement, administer, and enforce compliance with the BSA and associated regulations."  http://www.fincen.gov/what-we-do.  "The BSA is the nation's first and *most* comprehensive Federal *anti-money laundering and counter-terrorism financing* . . . *statute.*  In brief, the BSA authorizes the Secretary of the Treasury to issue regulations requiring banks and other financial institutions to take a number of precautions *against financial crime, including* . . . the filing of reports that have been determined to have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings, and certain intelligence and counter-terrorism matters." *Id.* (emphasis added). Thus, the text and immediate context of the regulation at issue establish that it is not part of an essentially regulatory civil scheme, but rather part of a

scheme that is much more concerned with criminal enforcement than with any civil

purpose. 31 C.F.R. § 1010.420 is part of a statutory scheme whose clear aim is law

enforcement.[4]

   b. <u>The legislative history of the BSA demonstrates that it was enacted primarily to aid criminal law enforcement.</u>

  The BSA's legislative history also makes it clear that the BSA and accompanying

regulations are essentially criminally-focused. The requirements of the BSA were

expressly conceived to assist criminal law enforcement agencies in targeting persons

owning secret foreign bank accounts. For example, the House Report on the BSA

explains that the foreign transaction reporting requirement was to be enacted because of

the "proliferation of white collar crime," which the House concluded had been aided by

secret foreign bank accounts; these crimes including organized criminal operations, tax

evasion, securities fraud and other schemes to defraud the United States, conspiracies

to steal from the United States, and money laundering. *See* H.R. Rep. No. 91-175, 91st

Cong., 2d Sess., at 10 (1970), reprinted in 1970 U.S.C.C.A.N. 4394, 4404.

The House Report also bemoaned that, "United States law enforcement agencies are

often delayed or totally frustrated when wrongdoers cloak their activities in the shield

---

[4] The IRS website describes the entire BSA as follows:

> Congress passed the Bank Secrecy Act in 1970 as the first laws
> to fight money laundering in the United States. . . . The
> documents filed by businesses under the BSA requirements are
> heavily used by law enforcement agencies, both domestic and
> international to identify, detect and deter money laundering
> whether it is in furtherance of a criminal enterprise, terrorism, tax
> evasion or other unlawful activity.
>
> https://www.irs.gov/businesses/small-businesses-self-
> employed/bank-secrecy-act

of foreign financial secrecy." *Id.* As the House Report makes clear, the BSA was intended to address the "frustrations" experienced by "law enforcement personnel" who, in the absence of the BSA's provisions, "must subject themselves to a time consuming and often fruitless foreign legal process" when conducting criminal investigations of undisclosed foreign bank accounts. *Id.*

The Senate Committee was equally concerned with the "growing use of secret foreign bank accounts for a wide variety of illegal purposes by U.S. citizens and residents . . . .  Tax evaders, stock swindlers and other white-collar criminals are becoming increasingly aware of the advantages of a secret foreign bank account." *See* S. Rep. No. 91-1139, 91st Cong., 2d Sess., at 3-4 (1970). The major purpose of the BSA, then, was to "root out criminal activity," thus negating a finding that its purpose is <u>essentially</u> regulatory. *Bionic Auto Parts and Sales, Inc. v. Fahner,* 721 F.2d 1072, 1082 (7th Cir. 1983) (while "there is a fine line between a regulatory purpose and the specific effort to root out criminal activity," a statute with the latter aim does not meet the first prong of the *Grosso* test).[5]

The BSA's legislative history makes it clear that the primary goal and purpose of the statute's reporting requirements were not to regulate an industry, but rather to enhance the evidence-gathering efforts of law enforcement in investigating and

---

[5]     As further evidence of the BSA's aim to aid criminal law enforcement, Congress placed the foreign account reporting requirements in Title 31 of the United States Code, rather than Title 26, the Tax Code, thereby enhancing law enforcement's ability to share information related to taxpayers' interests in foreign accounts for prosecutorial purposes. If the reporting requirements had been in Title 26, the information would have been limited to use by the IRS. *See* 26 U.S.C. § 6103 (prohibiting the disclosure of taxpayer information outside the IRS except in limited circumstances).

prosecuting financial crimes. As the Supreme Court stated in *California Bankers Ass'n v. Shultz,* 416 U.S. 21 (1974), the BSA "manifests a concern for the enforcement of the criminal laws," criminal law enforcement was "undoubtedly prominant [sic] in the minds of the legislators who considered the Act," and its reporting requirements "are focused in large part on the acquisition of information to assist in the enforcement of the criminal laws."  *Id.* at 76-77 (upholding facial validity of BSA, not addressing act of production privilege or required records exception).  If a *prominent* purpose of the BSA is criminal law enforcement, and it was enacted to rectify serious, organized efforts to avoid detection of criminal activity, the BSA does not have as its *essence* a civil regulatory goal. That there may have been some peripheral civil concerns behind the BSA does not render it *essentially* regulatory. *See Grosso,* 390 U.S. at 68; *Hajecate,* 683 F.2d at 901 (language and legislative history of the statute demonstrate that the essential character of its foreign account reporting provisions is "investigatory" and evidence a "presumption by Congress that secret foreign bank accounts and secret foreign financial institutions are inevitably linked to criminal activity in the United States."); *San Juan,* 405 F. Supp. at 693 (the "underlying purposes of Congress in promulgating [the BSA's] foreign reporting requirements . . . were *fundamentally prosecutorial*.") (emphasis added).

Finally, while no one would misinterpret the criminal law enforcement purpose of a group of FBI agents gathered in plain sight in their blue and yellow "raid" jackets, one might easily mistake a tax audit for a criminal tax investigation as the lines between the two are frequently blurred, look the same to a casual observer and many times go hand

in hand. Indeed, the IRS itself houses a Criminal Investigation Division (IRS-CI) where Special Agents are routinely charged with investigating tax and other financial crimes. To articulate its mission, IRS-CI has stated that: "Criminal Investigation serves the American public by investigating potential criminal violations of the Internal Revenue Code (IRC) and related financial crimes in a manner that fosters confidence in the tax system and compliance with the law." *Internal Revenue Manual* (IRM) § 9.1.1.2 (03-06-2017). Not surprisingly, one of IRS-CI's areas of investigative focus is money laundering. In turn, this program goal is explained as: "[The money laundering] strategy is designed to assure enforcement of the Bank Secrecy Act. . . ." IRM § 9.1.1.3.2 (11-04-2004).

Supporting IRS-CI's mission are employees from all substantive divisions within the agency, including IRS Revenue Agents. On information and belief, the assigned IRS Revenue Agent in this matter, Heather A. Styron, is a Special Enforcement Program (SEP) employee. SEP Revenue Agents are also guided in their duties by relevant provisions of the IRM, some of which are as follows: "Revenue Agents in SEP are financial investigative specialists and forensic accountants. In addition to general tax law knowledge and auditing skills, SEP agents are experts in the identification and development of cases with fraud potential." IRM § 4.16.1.3 (06-14-2011); "SEP agents submit referrals to [IRS-CI]  on cases meeting criminal criteria." IRM § 4.16.1.3.1 (06-14-2011); and, finally, "SEP agents devote a significant amount of time working joint investigations with [IRS-CI]." IRM § 4.16.1.3.6 (06-14-2011). Needless to say, Ms.

Styron—on account of where she is situated within the agency—likely works for IRS-CI in a supporting role more than many other Revenue Agents, and IRS-CI is officially committed to criminal enforcement of the BSA. Put another way, criminal enforcement is the primary goal of the BSA and the IRS is there to assist. And notwithstanding what appears to be the current positioning of this case in a civil examination context, shored up by the relatively routine IRS "regulator" language appearing in the supporting statement of Ms. Styron informing that: "In my capacity as a Revenue Agent, I am conducting an examination for the purpose of determining the correct federal income tax liabilities of Rajaram K. Matkari. . . ." Declaration of Heather A. Styron ("Styron Decl.), at ¶ 4, the unmistakable and, as yet unstated, purpose of Ms. Styron's probe is to develop a case for criminal referral to IRS-CI, or to work jointly with an IRS-CI Special Agent on an already existing criminal investigation targeting Mr. Matkari—all using the very foreign bank account (BSA) data that is sought herein.

On account of the BSA's primary and oft-repeated laser focus on criminal law enforcement (also including criminal tax enforcement)—most particularly in the context of this case—the first prong of the *Grosso* test is not met here as the primary purpose of IRS's investigation of Mr. Matkari is not "essentially regulatory".

2. **The records being sought are not those "customarily kept" by the regulated party.**

Under the second prong of the *Grosso* test, the records being sought must be ones that are "customarily kept" by the regulated party. For this factor to be satisfied, the records must be of a type which one would expect the regulated party to maintain in the

ordinary course of his or her affairs, if the regulation did not exist. *See, e.g., Marchetti,* 390 U.S. at 57 (types of information required by wagering statute at issue were not those which the defendant would have maintained in the course of his business, absent the regulation). The records sought by the government in this case are not of a kind that individual foreign bank-accountholders customarily would maintain if the BSA did not exist.

As an initial matter, the period of required recordkeeping under 31 C.F.R. § 1010.420 is five years, two years beyond the statute of limitations for civil tax adjustments, 26 U.S.C. § 6501.  Thus, one would not expect accountholders "customarily" to keep bank records or other documents relating to foreign accounts for such an extended period, absent the BSA regulations. Instead, keeping records for as long as the IRS can customarily assess additional tax related to one tax return (3 years), would ordinarily be the longest retention period for most taxpayers. *Id.*

Foreign banks, moreover, especially those in the "secrecy" jurisdictions that the BSA intended to target, are notorious for failing to provide their customers with records. *See e.g., [www.cbsnews.com/news/swiss-bank-to-pay-578m-in-us-tax-evasion-plea/](www.cbsnews.com/news/swiss-bank-to-pay-578m-in-us-tax-evasion-plea/)* (noting Swiss banks' practice of being "careful not to send account statements to U.S. clients in the United States . . . .").  Individuals regulated by 31 C.F.R. § 1010.420 therefore would often not even possess, much less maintain, records targeted by the regulation. Because the records sought by the Summons are not ones that are customarily kept by individuals regulated by 31 C.F.R. §1010.420 in the absence of the BSA, the Court should find that the second prong of the *Grosso* test is not met.

### 3. The records required to be maintained by 31 C.F.R. § 1010.420 lack "public aspects."

Finally, under the third prong of the *Grosso* test, in order for the required records exception to apply, the records at issue must also have "public aspects." *See Grosso,* 390 U.S. at 67-68. The Supreme Court in *Marchetti* rejected the notion that records assume "public aspects" simply because a law requires that they be kept. "The Government's anxiety to obtain information known to a private individual does not without more render that information public; if it did, no room would remain for the application of the constitutional privilege. Nor does it stamp information with a public character that the Government has formalized its demands in the attire of a statute; if this alone were sufficient, the constitutional privilege could be entirely abrogated by any Act of Congress." *Marchetti*, 390 U.S. at 57.

Moreover, as Justice Frankfurter explained, "[i]f records merely because required to be kept by law *ipso facto* become public records, we are indeed living in glass houses. Virtually every major public law enactment – to say nothing of State and local legislation – has record-keeping provisions." *Shapiro,* 335 U.S. at 50 (Frankfurter, J., dissenting). The third prong of the *Grosso* test therefore requires a fully separate analysis than the first prong inquiry into whether the statutory scheme is essentially regulatory.

Under this third prong analysis, courts have found that records acquire "public aspects" in three, somewhat-overlapping, ways: (1) when the records further a regulatory scheme which is essential in order to protect sectors of the public or to promote the public welfare, *see, e.g., In re Doe,* 711 F.2d 1187, 1291 (2nd Cir. 1983) (requirement that physicians maintain prescription records and forward copies to the

state was part of a comprehensive regime designed to regulate dissemination of dangerous drugs, rendering those prescription records "public"); *In re: Two Grand Jury Summons Duces Tecum Dated August 21, 1985,* 793 F.2d 69, 73 (2nd Cir. 1986) (requirement that attorneys file contingency fee arrangements with the New York Office of Court Administration was part of a regime designed to regulate the attorney-client relationship and the records therefore were "sufficiently 'public'"); (2) when the records are otherwise vital to the proper functioning of an essentially regulatory regime promulgated in response to emergency or other exigent conditions, *see, e.g., Shapiro,* 335 U.S. at 17-18 (records that were contemplated by Congress as a necessary wartime device and a condition for commercial operation under emergency price control regulations had sufficient "public aspects"); *Rajah v. Mukasey,* 544 F.3d at 442, 433 n. 3 (immigration documents such as passports and Forms I-94 fell within the required records exception as being essential to enforcement of immigration laws promulgated after 2001 terrorist attacks to ensure proper immigration status of immigrants from specified countries, such as, for example, Iran, Iraq, Libya and Sudan); or (3) when the records are routinely forwarded to a regulatory or licensing body, *see In re Doe,* 711 F.2d at 1291-92 (requirement that physicians forward copies of prescription records to New York State imbued those records with public aspects; and a Form W-2 had public aspects because of the requirement that it be filed with an individual's tax returns); *but cf. Smith v. Richert,* 35 F.3d 300, 304 (7th Cir. 1994) (Forms W-2 are protected by the act of production privilege unless they are required to be kept as part of a business operation).

An individual's personal bank records fall under none of these categories and do

*not* possess sufficient public aspects to satisfy the required records exception. The bank records required to be maintained by 31 C.F.R. § 1010.420 do not further a regulatory scheme that protects the public's welfare; they are not otherwise vital to the functioning of an emergency civil regulatory scheme; and they are not routinely disclosed to regulatory authorities. Note that, even in the course of annual FBAR reporting, personal foreign bank records themselves are not turned over to the government.

In *United States v. Porter,* 711 F.2d 1397 (7th Cir. 1983), a taxpayer who was a sole proprietor of a business appealed an order requiring the production of his bank records, including cancelled checks and bank deposit slips, in response to an IRS Summons. The court rejected the government's argument that, based on 26 U.S.C. § 6001, the required records exception negated the taxpayer's act of production privilege. *Id.* at 1405.  26 U.S.C. § 6001 requires taxpayers to "keep such records . . . as the [IRS] may from time to time prescribe," and the IRS has, pursuant to this authority, mandated that taxpayers "keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information."   26 C.F.R. § 1.6001-1(a).  The *Porter* court nevertheless held that 26 U.S.C. §  6001 cannot overcome the taxpayer's constitutional act of production privilege. *Cf. United States v. Cianciulli,* 2002 U.S. Dist. LEXIS 12535 at *9 (S.D.N.Y. July 10, 2002) (required records exception  does not apply to books, records

and other documents that are not tax returns or W-2 statements).[6]

In distinguishing *Shapiro,* the *Porter* court pointed out that the petitioner in *Shapiro,* unlike a taxpayer, was "required to keep . . . records as an ongoing condition of operating his business under a comprehensive government regulatory scheme."  711 F.2d at 1405. The court reasoned that "[the] taxpayer-IRS relationship is, instead, a more limited one which creates an imperative for access to records only in rare cases. . . ," and hence that "the taxpayer's substantive activities are not positively 'regulated' by the IRS sufficient to create a *Shapiro*-type interest in unconditional access to those records." *Id.* The court went on to observe that:

> [T]he very nature of the limited taxpayer-government relationship is, we think, insufficient to imbue the taxpayer's cancelled checks and deposit slips with "public aspects" as required under *Shapiro.* Unlike the transaction records [in *Shapiro*] which the Emergency Price Control Act provided would be routinely available to the government as a condition of the business' operation, a sole proprietor's checks and bank transactions are inspected by revenue authorities only in the unusual situation of an audit. This rarely attempted access hardly transforms the gamut of an individual businessman's financial records into an extension of the public archives.

*Id.  See also Cianciulli,* 2002 U.S. Dist. LEXIS 12535 at *9.

---

[6]    The court in *Smith v. Richert,* 35  F.3d at 303, also specifically distinguished the situation in *Shapiro* from that of a taxpayer: "A statute that merely requires a taxpayer to maintain records necessary to determine his liability for personal income tax is not within the scope of the required-records doctrine."  Indeed, *Smith* held that *even* Forms W-2 and 1099 may fall within the act of production privilege where, like the foreign bank account records here, they are not required to be kept as part of a *business operation.  Id.* at 304.

The relationship between the IRS and a taxpayer with a foreign bank account may not be meaningfully distinguished from the relationship between the IRS and the taxpayer in *Porter*. Both relationships are certainly much more limited than the relationship between the government and businesses operating under the pervasive wartime regulatory scheme at issue in *Shapiro*. Records required to be kept by the BSA thus do not have public aspects within the meaning of *Grosso*.

*Marchetti* and *Porter* reject the idea that requiring an individual to keep a record pursuant to any statutory scheme magically converts that record into a '"public record." If interpreted to the contrary, the Supreme Court's holdings in *Grosso* and *Marchetti*, defining the limits of what confers "public aspects" on records, are meaningless and the "public documents" prong of the *Grosso* test simply collapses into the "essentially regulatory" prong. Under the distinct analysis required by the third prong, private bank records are not public documents.[7]

---

[7] The court in *Smith v. Richert,* 35  F.3d at 303, also specifically distinguished the situation in *Shapiro* from that of a taxpayer: "A statute that merely requires a taxpayer to maintain records necessary to determine his liability for personal income tax is not within the scope of the required-records doctrine."  Indeed, *Smith* held that *even* Forms W-2 and 1099 may fall within the act of production privilege where, like the foreign bank account records here, they are not required to be kept as part of a *business operation.  Id. at 304.*

## III. CONCLUSION

The Summons calls for the production of records which are clearly within the Fifth Amendment's act of production privilege. The narrow "required records exception" to that constitutional privilege cannot apply unless all three prongs of the *Grosso* test are met. None of the three prongs has been met here. The documents sought by the Summons do not, therefore, fall within the narrow required records exception to the Fifth Amendment act of production privilege. On that basis, the Court should decide that the present IRS Summons served upon Mr. Matkari should not be enforced.

Respectfully submitted,

Dated: August 13, 2018          by: /s/ Michael F. Arvin
                                **Michael F. Arvin**
                                Michael F. Arvin, Attorney, PC
                                3773 Cherry Creek North Drive
                                Suite 575
                                Denver, Colorado 80209
                                Telephone: (303) 629-6640
                                FAX:      (303) 629-6679
                                E-mail: arvinlawoffices-ecf@arvin-denver.com
                                Attorney for Respondent Rajaram K. Matkari

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of August, 2018, I electronically filed **RAJARAM K. MATKARI'S WRITTEN RESPONSE TO ORDER TO SHOW CAUSE REGARDING GOVERNMENT'S PETITION TO ENFORCE IRS SUMMONS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:


rika.valdman@usdoj.gov

Rika Valdman
U.S. Dept. of Justice Tax Division
PO Box 683
Ben Franklin Station
Washington DC 20044-0683
Attorney for the Government


_/s/ Michael F. Arvin_