IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-mc-00051-MSK-KLM

USA,

      Petitioner,

v.

RAJARAM K. MATKARI,

      Respondent.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Petitioner's **Petition to Enforce IRS Summons** [#1][1] (the "Petition"). Respondent filed a Response [#14] in opposition to the Petition and Petitioner filed a Reply [#15]. The Petition has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C.COLO.LCivR 72.1(c)(3). *See* [#4]. The Court has reviewed the Petition, the Response, the Reply, the entire case file, and the applicable law and is sufficiently advised in the premises. For the reasons set forth below, the Court **RECOMMENDS** that the Petition [#1] be **GRANTED**.[2]

---

[1] "[#1]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Recommendation.

[2] Although Section 7604(b) of the Internal Revenue Code appears to confer jurisdiction on Magistrate Judges to decide enforcement proceedings brought by the IRS where a taxpayer neglects or refuses to obey a summons, *see* 26 U.S.C. § 7604(b), several courts have determined that a summons enforcement order is a final dispositive and appealable order that is beyond the authority of a Magistrate Judge to issue. *See United States v. Williamson*, No. 2:18-mc-00101-DBH, 2018 WL 4807965, at *1 n.1 (D. Me. Oct. 4, 2018), *report and recommendation adopted*,

- 1 -

# I. Background

Respondent resides in the State of Colorado. *Petition* [#1] ¶ 2. Petitioner is the Internal Revenue Service ("IRS"), which is attempting to exercise its civil audit power to conduct an investigation for the purpose of determining Respondent's federal income tax liabilities for 2011 through 2014, and whether Petitioner should assess penalties for Respondent's failure to properly report his interest in foreign bank accounts. *Id.* ¶ 4. The administrative summons (the "Summons") was issued to Respondent directing him to appear on March 12, 2018, at 9:00 a.m. to testify and produce for examination certain books, papers, records, or other data as described in the summons. *Id.* ¶ 5.

Specifically, the Summons demands "any and all records required to be maintained pursuant to 31 C.F.R. § 1010.420 (§103.32 prior to March 1, 2011) relating to foreign financial accounts that you had/have a financial interest in…." *Summons* [#1-1] at 6. That regulation, 31 C.F.R. § 1010.420, is promulgated under the Currency and Foreign Transaction Reporting Act of 1970, 31 U.S.C. § 1051 *et seq.*, generally referred to as the Bank Secrecy Act ("BSA"). The regulation requires each person having "a financial interest in or signature or other authority over" a foreign financial account to maintain records of that account for five years and to keep those records available "at all times . . . for inspection as authorized by law." 31 C.F.R. § 1010.420. The records must

2018 WL 5284199 (D. Me. Oct. 24, 2018) ("An order enforcing an IRS summons is a dispositive remedy requiring de novo review by an Article III judge."); *United States v. Funes*, No. 8:16-cv-273, 2016 WL 4995037, at *1 (D. Neb. Sept. 19, 2016) (citing *Reisman v. Caplin*, 375 U.S. 440, 449 (1964); *United States v. Bell*, 57 F. Supp. 2d 898, 904 (N.D. Cal. 1999) ("the weight of authority indicates that § 7604(b) does not confer jurisdiction upon a magistrate judge."). Thus, in an abundance of caution, the Court enters a Recommendation on the Petition [#1].

"contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period." *Id.*

Respondent failed to appear on March 12, 2018, and has failed to comply with the Summons. *Petition* [#1] ¶ 8. Therefore, Petitioner initiated this action on March 23, 2018, by filing the Petition [#1] in which it seeks to enforce the Summons against Respondent. On April 30, 2018, the Court ordered Respondent to show cause as to why he should not comply with and obey the Summons. *Order to Show Cause* [#6]. After the Court granted Respondent two extensions of time to respond to the Order to Show Cause [#6], *see Minute Orders* [#9, #13], Respondent filed his Response [#14] on August 13, 2018, in which he asserts his Fifth Amendment act of production privilege as grounds for not complying with the Summons.

## II. Legal Standard

### A.    IRS Authority to Enforce Summons

The IRS has broad authority to issue summonses to determine a taxpayer's tax liabilities. *United States v. Clarke*, 573 U.S. 248, 249 (2014). The Internal Revenue Code authorizes the Secretary of the Treasury to issue administrative summonses to "examine any books, papers, records, or other data" for the purpose of determining tax liability or collecting the tax liability of a taxpayer. 26 U.S.C. § 7602(a). The statute grants to the IRS "expansive information-gathering authority." *United States v. Arthur Young & Co.*,

465 U.S. 805, 816 (1984). When a taxpayer fails to obey an IRS summons, the United States may petition the court to enforce the summons. *See* 26 U.S.C. §§ 7402(b), 7604.

In *United States v. Powell*, the Supreme Court held that the IRS must establish a prima facie case to enforce a summons by demonstrating the following: (1) "[t]he investigation must be conducted for a legitimate purpose;" (2) "the summons must be relevant to that purpose;" (3) "the IRS must not already have the information sought;" and (4) "the IRS must have followed the administrative steps required by the Internal Revenue Code." *Jewell v. United States*, 749 F.3d 1295, 1297 (10th Cir. 2014) (citing *United States v. Powell*, 379 U.S. 48, 57-58 (1964)) (internal quotation marks and brackets omitted). The government's burden to make a prima facie case "is a slight one because the statute must be read broadly in order to ensure that the enforcement powers of the IRS are not unduly restricted." *United States v. Balanced Fin. Mgmt., Inc.*, 769 F.2d 1440, 1443 (10th Cir. 1985); *see Becker v. Kroll*, 494 F.3d 904, 916 (10th Cir. 2007) ("an investigatory or administrative subpoena is not subject to the same probable cause requirements as a search warrant"). The IRS can meet its burden by producing an affidavit of the agent who issued the summons. *Clarke*, 573 U.S. at 254; *Rader v. United States*, No. 08-cv-00568-WDM-MEH, 2008 WL 4949168, at *6 (D. Colo. Nov. 17, 2008).

Once the IRS has made a prima facie case, the summons should be enforced unless the taxpayer can show that the IRS is attempting to abuse the Court's process. *Rader*, 2008 WL 4949168, at *6. "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith

of the particular investigation." *Powell*, 379 U.S. at 58. "The [taxpayer's] burden is a heavy one." *United States v. Balanced Fin. Mgmt., Inc.*, 769 F.2d 1440, 1444 (10th Cir. 1985). Indeed, "[e]nforcement of a summons is generally a summary proceeding to which a taxpayer has few defenses." *United States v. Derr*, 968 F.2d 943, 945 (9th Cir. 1992).

## B. Fifth Amendment Act of Production Privilege

The Fifth Amendment provides that "[n]o person . . . shall be [c]ompelled in any criminal case to be a [w]itness against himself." U.S. Const. Amend. V. The privilege against self-incrimination is not absolute: "the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a [t]estimonial [c]ommunication that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408 (1976).

The Supreme Court has recognized that "[t]he act of producing evidence in response to a subpoena [ ] has communicative aspects of its own, wholly aside from the contents of the papers produced." *Id.* at 410; *see also United States v. Doe*, 465 U.S. 605, 612 (1984) ("A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect."). Document production can communicate that (1) "documents responsive to a given subpoena exist;" (2) "they are in the possession or control of the subpoenaed party;" (3) "the documents provided in response to the subpoena are authentic;" and (4) "the responding party believes that the documents produced are those described in the subpoena." *United States v. Hubbell*, 167 F.3d 552, 567-68 (D.C. Cir. 1999), *aff'd*, 530 U.S. 27 (2000); *see also In re Foster*, 188 F.3d 1259, 1269-70 (10th Cir. 1999) (the act of

production inquiry is "focused on proof of the document's existence, possession, and authenticity[.]" (citing *Fisher*, 425 U.S. at 410)). Accordingly, the production of documents in response to a summons or subpoena may be privileged where it is "the equivalent of forced testimony as to the existence, unlawful possession, and/or authenticity of the documents, as well as a belief that the produced documents matched those requested by the subpoena." *In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999*, 191 F.3d 173, 176 (2d Cir. 1999) (citing *Fisher*, 425 U.S. at 410).

## C.    The Required Records Exception

One exception to the act of production privilege is the required records exception which is also referred to as the "Required Records Doctrine." Under the required records exception, the act of production privilege cannot be invoked to resist "the production of records whose creation and maintenance is required as a condition of voluntarily engaging in a highly regulated activity." *United States v. Chen*, 815 F.3d 72, 78 (1st Cir. 2016) (citing *Baltimore City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 556 (1990)); *see also In re Doe*, 711 F.2d 1187, 1191 (2d Cir. 1983) (Under the required records exception, "a person whose records are required to be kept by law has no Fifth Amendment protection against self-incrimination when these records are directed to be produced.").

The exception derives from *Shapiro v. United States*, 335 U.S. 1 (1948), which concerned a wholesaler of fruit and produce who was required to keep and "preserve for examination" various business records pursuant to a regulation promulgated under the Emergency Price Control Act. 335 U.S. at 4. The wholesaler was subsequently served

with an administrative subpoena which directed him to produce certain of these records before the Office of Price Administration. *Id.* The wholesaler complied but asserted his constitutional privilege against self-incrimination. *Id.* at 4-5. The Supreme Court rejected the wholesaler's claim of privilege, reasoning that he had voluntarily assumed a duty to maintain records when he chose to engage in the regulated activity. *Id.* at 17. The Court stated that "the privilege which exists as to private papers cannot be maintained in relation to 'records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established.'" *Id.* at 33 (quoting *Davis v. United States*, 328 U.S. 582, 589, 590 (1946)). The Court further stated that "it cannot be doubted" that the business records in question had "public aspects," and thus held that the wholesaler, as the records' custodian, could not properly assert a privilege as to them. *Id.* at 34.

The Seventh Circuit has succinctly explained the rationale behind the required records exception as follows:

> One of the rationales, if not the main rationale, behind the Required Records Doctrine is that the government or a regulatory agency should have the means, over an assertion of the Fifth Amendment Privilege, to inspect the records it requires an individual to keep as a condition of voluntarily participating in that regulated activity. That goal would be easily frustrated if the Required Records Doctrine were inapplicable whenever the act of production privilege was invoked.

> The voluntary choice to engage in an activity that imposes record-keeping requirements under a valid civil regulatory scheme carries consequences, perhaps the most significant of which, is the possibility that those records might have to be turned over upon demand, notwithstanding any Fifth Amendment privilege. That is true whether the privilege arises by virtue of the contents of the documents or the by act of producing them.

*In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d 903, 908-09 (7th Cir. 2012) (internal citations omitted); *accord, United States v. Chabot*, 793 F.3d 338, 349 (3d Cir. 2015); *In re Grand Jury Proceedings, No. 4-10*, 707 F.3d 1262, 1274 (11th Cir. 2013); *In re Grand Jury Subpoena*, 696 F.3d 428, 433 (5th Cir. 2012); *see also In re Grand Jury Proceedings*, 601 F.2d 162, 168 (5th Cir. 1979) (The exception "has been explained on the basis that the public interest in obtaining such information outweighs the private interest opposing disclosure . . . and the further rationale that such records become tantamount to public records." (internal citations omitted)).

In *Grosso v. United States*, 390 U.S. 62 (1968), the Supreme Court formulated the following standard for the required records exception to apply:

> The premises of the doctrine, as it is described in *Shapiro*, are evidently three: first, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents.

390 U.S. at 67-68. Generally, courts apply this standard by analyzing each of the above three "premises," or elements, to determine whether the required records exception applies. *See e.g., In re Grand Jury Proceedings, No. 4-10*, 707 F.3d at 1269; *In re Grand Jury Subpoena*, 696 F.3d at 433, *In re Grand Jury Subpoena*, 21 F.3d 226, 228 (8th Cir. 1994).

### III.  Analysis

### A.    Petitioner's Prima Facie Case to Enforce the Summons

In the Petition [#1], the IRS has submitted Declarations from Agents Michael A. Salas ("Salas"), *Salas Decl.* [#1-1], and Agent Heather A. Styron ("Styron"), *Styron Decl.*

[#1-2], to support its prima facie case for the enforcement of the Summons. Agent Salas personally served Respondent with a copy of the Summons. *Salas Decl.* [#1-1] ¶ 5. Agent Salas also sent a copy of the Summons by certified mail to Respondent's counsel, Mr. Michael Arvin. *Id.* ¶ 6. Because Agent Salas was scheduled to retire from the IRS on March 31, 2018, the matter was reassigned to Agent Styron. *Id.* ¶ 4. Agent Styron is currently conducting the investigation into whether Respondent is liable for any penalties stemming from his failure to properly file information regarding his foreign bank account activity during the years 2011 through 2014. *Styron Decl.* [#1-2] ¶ 15.

Agent Styron asserts that her examination has revealed that various transfers were made between Respondent's accounts in India and Hong Kong during the years 2011 through 2014, and that Respondent "has not disclosed the full extent of his foreign bank accounts and investments on his income tax returns, and may not have reported all of the income from his foreign bank accounts to the United States." *Id.* ¶ 8. Agent Styron declares that the information sought (including bank records; credit, debit, and charge cards; brokerage and securities accounts; and ownership documents) is relevant and is not already in the possession of the IRS. *Id.* ¶ 14. Agent Styron further declares that she has taken all the administrative steps required by the Internal Revenue Code and that there has been no criminal referral of the investigation to the Department of Justice. *Id.* ¶¶ 17, 18.

Based on Agent Styron's declaration, the Court finds that Petitioner has established a prima facie case for the enforcement of the summons. The declaration shows that the investigation of Respondent is for a legitimate purpose, the information

sought may be relevant to the investigation, the IRS does not already possess the information, and all the required administrative steps have been followed. *See Jewell*, 749 F.3d at 1297 (citing *Powell*, 379 U.S. at 57-58). Respondent makes no argument to rebut Petitioner's prima facie case. Instead, Respondent asserts an affirmative defense under the Fifth Amendment which the Court addresses in the following section.

**B.    Respondent's Fifth Amendment Act of Production Privilege**

Respondent first asserts that the Summons and 31 C.F.R. § 1010.420 implicate his Fifth Amendment act of production privilege by requiring him to produce records of his foreign financial accounts. *Response* [#14] at 3-6. Respondent then dedicates the majority of his Response to arguing that his Fifth Amendment privilege is not precluded by the required records exception because, despite the weight of authority to the contrary, that exception should not apply to the instant case. *Id.* at 6-27. Petitioner does not directly dispute Respondent's assertion that his Fifth Amendment act of production privilege has been implicated but argues that the required records exception does apply to rebut Respondent's asserted privilege. *Reply* [#15] at 4-17. Accordingly, the Court assumes that Respondent's Fifth Amendment act of production privilege has been implicated by the Summons and limits its analysis to whether the required records exception applies to bar Respondent from invoking the privilege.

Respondent acknowledges that several Courts of Appeals have recently and clearly held that the required records exception does apply to cases indistinguishable from the present action. *Response* [#14] at 3. Indeed, eight circuits have found that the required records exception applies to documents sought in a summons for foreign bank

account information under 31 C.F.R. § 1010.420. *See Chen*, 815 F.3d 72 (1st Cir. 2016); *Chabot*, 793 F.3d 338 (3d Cir. 2015); *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d 339 (2d Cir. 2013); *United States v. Under Seal*, 737 F.3d 330 (4th Cir. 2013); *In re Grand Jury Proceedings, No. 4-10*, 707 F.3d 1262 (11th Cir. 2013); *In re Grand Jury Subpoena*, 696 F.3d 428 (5th Cir. 2012); *In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d 903 (7th Cir. 2012); *In re Grand Jury Investigation M.H.*, 648 F.3d 1067 (9th Cir. 2011).

The Tenth Circuit, however, has not addressed the issue. Thus, Respondent generally avers that "the application of the required records exception by other circuits in the context of foreign financial account records under the BSA is an unconstitutional extension of Supreme Court precedent that will ultimately be rejected by the Tenth Circuit or reversed by the Supreme Court." *Response* [#14]. Petitioner contends that Respondent is mistaken and that, pursuant to *Grosso* and the numerous appellate decisions cited above, the required records exception does apply to this case to defeat Respondent's claim of privilege. [#15] at 2.

To resolve this dispute, the Court analyzes the three elements set forth in *Grosso* which the parties agree is the proper standard to apply. *See Response* [#14] at 10-27; *Reply* [#15] at 4-15. Although this appears to be an issue of first impression in the Tenth Circuit, the Court ultimately agrees with Petitioner that the BSA's record-keeping requirement satisfies the three *Grosso* elements to fall within the required records exception.

1.     **First *Grosso* Element – "Essentially Regulatory" Purpose**

The first *Grosso* element examines whether the purpose of the government's inquiry at issue is "essentially regulatory." 390 U.S. at 68. Under this element, the relevant legislation must be directed toward "an essentially noncriminal and regulatory area of inquiry," and not be targeted "at a highly selective group inherently suspect of criminal activities." *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965). In considering whether legislation is essentially regulatory or criminal in nature, "it is irrelevant that records kept for regulatory purposes may be useful to a criminal grand jury investigation." *In re M.H.*, 648 F.3d at 1073 (internal quotation marks, modification, and citation omitted). "Instead, [courts] consider whether the statutory or regulatory requirement involves an area permeated with criminal statutes, whether it is aimed at a highly selective group inherently suspect of criminal activities, and whether complying with the requirement would generally . . . prove a significant link in a chain of evidence tending to establish guilt." *Id.* (internal quotation marks and citation omitted). [3]

Respondent argues that the language, context, and legislative history of the BSA demonstrate that the purpose of the record-keeping requirement is criminal in nature and not "essentially regulatory." *Response* [#14] at 14-21. Specifically, Respondent quotes 31 U.S.C. § 5311 which defines the purpose of the BSA to "require certain reports or records where they have a high degree of usefulness in *criminal*, tax, or regulatory

---

[3] Respondent argues, without citing authority, that the first *Grosso* element focuses on the government's "purpose" or "intent" in promulgating the relevant statute. *Response* [#14] at 12. However, this view was explicitly rejected by the First Circuit. *See Chen*, 815 F.3d at 79 n.4 ("We agree with the United States that it mischaracterizes the inquiry [under the first element] to say it is a matter of ascertaining the hypothetical subjective 'intent' of Congress. Instead, the focus is on the nature of the underlying activity." (citing *Grosso*, 390 U.S. at 68)).

investigations or proceedings...." *Id.* at 15 (emphasis in the original). Additionally, Respondent notes that 31 C.F.R. § 1010.420 contains a five-year record-keeping requirement, which coincides with the criminal statute of limitations for willfully failing to file a Foreign Bank Account Report ("FBAR"), 18 U.S.C. § 3282, rather than the three-year statute of limitations for civil tax adjustments contained 26 U.S.C. § 6501. *Id.* at 15-16. Respondent further states that "it is very significant that these regulations are administered by FinCEN, the Financial *Crimes* Enforcement Network [ ] of the Department of the Treasury" and that the BSA "'is the nation's first and most comprehensive Federal *anti-money laundering and counter-terrorism financing* . . . *statute.*'" *Id.* at 16 (emphasis in the original) (quoting http://www.fincen.gov/what-we-do). Finally, Respondent provides a lengthy discussion of the BSA's legislative history which, according to Respondent, makes clear "that the primary goal and purpose of the statute's reporting requirements were not to regulate an industry, but rather to enhance the evidence-gathering efforts of law enforcement in investigating and prosecuting financial crimes." *Id.* at 18-19. Based on these arguments, Respondent avers that the BSA and 31 C.F.R. § 1010.420 demonstrate "part of a scheme that is much more concerned with criminal enforcement than with any civil purpose" and that "the IRS's investigation of [Respondent] is not 'essentially regulatory.'" *Id.* at 16-17, 21.

With respect to the general purpose of the BSA, Respondent fails to address the fact that many of his arguments have been considered and rejected by other courts. For instance, in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), the Supreme Court addressed similar arguments and rejected them insofar as they applied to the BSA

generally. 416 U.S. at 76-77. Although Respondent quotes one statement in *Shultz* for the proposition that the BSA's record-keeping provisions are "focused in large part on the acquisition of information to assist in the enforcement of the criminal laws," *Response* [#14] at 19 (quoting *Shultz*, 416 U.S. at 76), Respondent omits the Supreme Court's conclusion that "the fact that a legislative enactment manifests a concern for the enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it," *Shultz*, 416 U.S. at 77. Indeed, it is this conclusion in *Shultz* that other circuits have cited in finding that the BSA is "essentially regulatory" in nature. *See Under Seal*, 737 F.3d at 335 (citing *Shultz* for the Supreme Court's observation "that a statute which includes a criminal law purpose in addition to civil regulatory matters does not strip the statute of its status as 'essentially regulatory'"); *In re Grand Jury Proceedings, No. 4-10*, 707 F.3d at 1270-71(11th Cir. 2013); *In re M.H.*, 648 F.3d at 1073-74 (noting that *Shultz* considered and rejected the argument that § 1010.420 is criminal in nature because the BSA's "primary purpose is to detect criminal conduct, specifically money laundering, terrorism and tax evasion").

Moreover, although Respondent briefly acknowledges the eight circuit decisions that have found that the BSA is essentially regulatory in nature, Respondent fails to distinguish those cases from the present action or explain with specificity why they were wrongly decided. Respondent fails to do so despite the fact that many of these decisions rejected the precise arguments Respondent raises in his Response [#14]. *See e.g., Chen*, 815 F.3d at 76 ("Nonetheless, rooting out criminal activity was not Congress's only interest, and the justifications for the BSA's reporting and recordkeeping requirements

extend far beyond the criminal context. Merely looking at the text of the statute reveals that its purposes are diverse. The text itself points to the utility of the required records in the tax, regulatory, and counterterrorism contexts. And to the extent one looks at legislative history, it confirms this view." (internal citation omitted)); *Chabot*, 793 F.3d at 347 ("An equally important objective of both the [BSA] and § 1010.420, however, is to monitor and facilitate compliance with currency regulation and tax laws.... Accordingly, like our sister circuits that have addressed these arguments, we find the [appellant's] arguments that § 1010.420 is an essentially criminal scheme to be unpersuasive." (internal citations omitted)); *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F. 3d at 348 & n.5 (rejecting the argument that the criminal purpose of the BSA, a "multi-faceted statute," is evidenced by 31 U.S.C. § 5311 listing "criminal investigations" first or by the fact that FinCEN utilizes the statute in pursuing criminal investigations); *Under Seal*, 737 F.3d at 336 ("Because the BSA's recordkeeping requirements serve purposes unrelated to criminal law enforcement and the provisions do not apply exclusively to those engaged in criminal activity, we find that those requirements are 'essentially regulatory.'"); *In re Grand Jury Proceedings, No. 4-10*, 707 F. 3d at 1271 ("Even ignoring the non-criminal purposes of the BSA, the question is not whether Congress was subjectively concerned about crime when enacting the BSA's recordkeeping and reporting provisions, but rather whether these requirements apply exclusively or almost exclusively to people engaged in criminal activity." (internal citation omitted)); *In re Grand Jury Subpoena*, 696 F.3d at 434 ("the Treasury Department shares the information it collects pursuant to the [BSA's] requirements with other agencies . . . none of which are empowered to bring criminal

prosecutions." (internal citation omitted)); *In re M.H.*, 648 F.3d at 1074 ("Therefore, that Congress aimed to use the BSA as a tool to combat certain criminal activity is insufficient to render the BSA essentially criminal as opposed to essentially regulatory.").

As to 31 C.F.R. § 1010.420's five-year record-keeping requirement coinciding with the criminal statute of limitations for willfully failing to file an FBAR, 18 U.S.C. § 3282, Petitioner rightfully notes that Respondent ignores several aspects of 26 U.S.C. § 6501's statute of limitations for civil tax adjustments that render this "coincidence" less significant. *Reply* [#15] at 9. First, Respondent does not address the fact that the three-year statute of limitations for civil tax adjustments under 26 U.S.C. § 6501 is three years *after the return was filed*, and the fact that the period for assessment does not begin to run *until the return is filed.* *Id.* Second, Respondent ignores the exceptions to 26 U.S.C. § 6501(a), which specifically provide that assessments can occur at any time in the event of a false or fraudulent return, willful attempt to evade tax, or failure to file a return. *Id.* (citing 26 U.S.C. § 6501(c)). Finally, Respondent "also ignores 26 U.S.C. § 6501(e) [which] provides that in situations involving substantial omission of items, assessments can be done within 6 years after the return was filed." *Id.*

Finally, Respondent also argues "on information and belief" that Agent Styron, the Revenue Agent assigned to Respondent's case, is a "Special Enforcement Program (SEP) employee" that "likely works for [the IRS's Criminal Investigation Division ("IRS-CI")] in a supporting role more than many other Revenue Agents, and [that] IRS-CI is officially committed to criminal enforcement of the BSA." *Response* [#14] at 20-21. The Court agrees with Petitioner that, in addition to being purely speculative and not supported

by any evidence, this argument is irrelevant to the general statutory scheme of the BSA for purposes of the first element under *Grosso*. *See In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d at 349 (noting that the "essentially regulatory" test "inquire[s] into the purposes of the regulatory scheme pursuant to which records are required – a necessarily generalized inquiry").

In conclusion, the Court agrees with Petitioner and the eight Courts of Appeals that the BSA's record-keeping requirement is "essentially regulatory." *See Grosso*, 390 U.S. at 68. Unlike the regulation at issue in *Albertson*, 382 U.S. 70, which required individuals to register their involvement in subversive activities, there "is nothing inherently illegal about having or being a beneficiary of an offshore foreign bank account . . . [and] owners of these accounts are not 'inherently suspect.'" *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d at 347-348 (quoting *In Re M.H.*, 648 F.3d at 1075-76); *see Chabot*, 793 F.3d at 345. Accordingly, because 31 C.F.R. § 1010.420 is essentially regulatory in nature, the Court finds that the first *Grosso* element under the required records exception is satisfied.

### 2. Second *Grosso* Element – "Customarily Kept"

The second *Grosso* element examines whether the records sought are of the type "customarily kept." *Grosso*, 390 U.S. at 68; *Marchetti v. United States*, 390 U.S. 39, 57 (1968). The Ninth Circuit has noted that there is no "specific definition to the term 'customarily kept,' but records appear to be customarily kept if they would typically be kept in connection with the regulated activity." *In re M.H.*, 648 F.3d at 1076. Thus, "[a]s the case law dealing with this requirement suggests, the Fifth Amendment does not apply

when the Government compels individuals to create records that they would customarily keep." *Id.*

As stated above, 31 C.F.R. § 1010.420 requires the following foreign account information be maintained for five years: "the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period." The Ninth Circuit held that this information "is basic account information that bank customers would customarily keep, in part because they must report it to the IRS every year as part of the IRS's regulation of offshore banking, and in part because they need the information to access their foreign bank accounts." *Id.* In turn, the Third Circuit stated that "[c]ommon sense tells us that this is all information that an accountholder needs in order to access funds located abroad or at home. Because reasonable accountholders would retain this information in order to readily access their foreign accounts, we conclude that these are records that accountholders customarily would keep." *Chabot*, 793 F.3d at 347 (citing *In re M.H.*, 648 F. 3d at 1076). The Fifth Circuit similarly concluded that foreign financial account records are "customarily kept" in satisfaction of the second *Grosso* element where they "are of the same type that the witness must report annually to the IRS pursuant to the IRS's regulation of offshore banking: the name, number, and type of account(s), the name and address of the bank where an account is held, and the maximum value of the account...." *In re Grand Jury Subpoena*, 696 F.3d at 435; *see also In re Grand Jury*

*Proceedings, No. 4-10*, 707 F.3d at 1272 ("Simply put, the [ ] argument that these records are not 'customarily kept' is a non-starter.").

Here, Respondent provides two arguments as to why the "customarily kept" requirement is not satisfied in this case. *Response* [#14] at 21-22. First, Respondent asserts that because 31 C.F.R. § 1010.420's record-keeping requirement is two years longer than the statute of limitations for civil tax adjustments under 26 U.S.C. § 6501, "one would not expect accountholders 'customarily' to keep bank records or other documents relating to foreign accounts for such an extended period, absent the BSA regulations." *Id.* at 22. Second, Respondent avers that foreign banks, "especially those in the 'secrecy' jurisdictions that the BSA intended to target, are notorious for failing to provide their customers with records." *Id.* (citation omitted). Therefore, according to Respondent, "[i]ndividuals regulated by 31 C.F.R. § 1010.420 [ ] would often not even possess, much less maintain, records targeted by the regulation." *Id.*

The Court is not persuaded by Respondent's arguments for three reasons. First, Respondent does not cite any authority to support his position. Second, and as discussed *supra*, Respondent's reliance on 26 U.S.C. § 6501 is incomplete as he has failed to address the exceptions to that section relevant to his argument. Third, and most notable, Respondent's two arguments were also raised in *Under Seal*, 737 F.3d 330, which the Fourth Circuit rejected:

> The [appellants] argue that individuals are unlikely to keep account records for the five years required under 31 C.F.R. § 1010.420, given the three-year statute of limitations for civil tax adjustments, and because foreign banks are notorious for failing to provide customers with records. This argument fails, however, given the clear language in § 1010.420 that requires the retention of the account information that has been subpoenaed. Because

> it is the failure to maintain such records that can be probative of criminal activity, rather than the contents of the records, foreign account holders can reasonably be expected to follow the law governing their choice to engage in offshore banking.

737 F.3d at 336 & n.5 ("We also find the [appellants'] five-year argument dubious in view of 26 U.S.C. § 6501(e), which contains a six-year statute of limitations for many taxpayers and fosters a generally accepted accounting practice to advise taxpayers to keep their pertinent records until the § 6501(e) period has expired.").

Given the overwhelming precedent in other circuits and Respondent's failure to refute the second *Grosso* element, the Court agrees with Petitioner that the records sought pursuant to 31 C.F.R. § 1010.420 are a kind "customarily kept." Accordingly, the Court finds that the second *Grosso* element under the required records exception is satisfied.

### 3. Third *Grosso* Element – "Public Aspects"

The third *Grosso* element requires that "the records [sought] must have assumed 'public aspects' which render them at least analogous to public documents." *Grosso*, 390 U.S. at 68. In finding that the records sought under the BSA assume "public aspects" for purposes of the required records exception, the Second Circuit explained:

> [R]ecords required to be created under an otherwise valid regulatory regime necessarily have "public aspects" for purposes of the required records exception to the Fifth Amendment production privilege. A constitutionally infirm statute cannot recharacterize private information as public. However, information that a statute lawfully requires a person to record is legally distinct from information that no statute lawfully requires anyone to record. This distinction is what the "public aspects" prong of the required records doctrine recognizes. The record need not be 'public' in that anyone can examine or copy it at any time; it need only be lawfully required to be kept.

*In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d at 351 (citing *Marchetti*, 390 U.S. at 57; *Donovan v. Mehlenbacher*, 652 F.2d 228, 231 (2d Cir. 1981)). In short, "[w]here personal information is compelled in furtherance of a valid regulatory scheme, as is the case here, that information assumes a public aspect." *Id.* (quoting *In re M.H.*, 648 F.3d at 1077).

Respondent first appears to assert that the third *Grosso* element may be satisfied only in one of the following three circumstances: (1) "when the records further a regulatory scheme which is essential in order to protect sectors of the public or to promote the public welfare;" (2) "when the records are otherwise vital to the proper functioning of an essentially regulatory regime promulgated in response to emergency or other exigent conditions;" or (3) "when the records are routinely forwarded to a regulatory or licensing body." *Response* [#14] at 23-24 (citations omitted). On this premise, Respondent argues that an individual's bank records do not fall within any of the three categories to demonstrate sufficient public aspects to satisfy the required records exception. *Id.* at 24.

An almost identical argument was raised by the appellant in *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d at 351 ("[The appellant] urges us to hold that the test requires one of three factors: records have 'public aspects' when they 'are a direct mainstay of a regulatory scheme that promotes the public welfare,' 'are vital to a regulatory regime promulgated in response to emergency or other exigent conditions,' or 'are routinely forwarded to a regulatory or licensing body as a means of protecting the public.'" (citations omitted)). In rejecting this argument, the Second Circuit stated that "[a]lthough [the appellant] cites to authority in support of the proposition that each of these

is sufficient to establish 'public aspects,' we see no evidence that one of these three prongs *must* be met to conclude that the records have a 'public aspect.'" *Id.* (emphasis added). Here, Respondent neither addresses this Second Circuit opinion nor cites any legal authority for the proposition that the "public aspects" element can only be satisfied in the three circumstances provided above. Accordingly, the Court reaches the same conclusion as the Second Circuit and rejects the premise of Respondent's argument that records may assume "public aspects" only in three circumstances. *See also Under Seal*, 737 F.3d at 337 ("Although the [respondents] argue that substantive regulations designed to protect the public from harm and open to public access may imbue otherwise private documents with public aspects, it does not follow that public aspects exist *only* under these circumstances." (emphasis in the original)).

Respondent next argues that the Court should follow the decision in *United States v. Porter*, 711 F.2d 1397 (7th Cir. 1983), where the Seventh Circuit rejected the government's argument that, based on 26 U.S.C. § 6001, the required records exception negated the taxpayer's act of production privilege with respect to an IRS summons seeking cancelled checks and bank deposit slips. *Response* [#14] at 25-27; *see Porter*, 711 F.2d at 1405. Although *Porter* concerned the record-keeping requirement under 26 C.F.R. § 1.6001-1(a), rather than 31 C.F.R. § 1010.420, Respondent argues that "[t]he relationship between the IRS and a taxpayer with a foreign bank account may not be meaningfully distinguished from the relationship between the IRS and the taxpayer in *Porter*." *Response* [#14] at 27.

Aside from this conclusory statement, Respondent does not make any argument as to why the Court should find *Porter* dispositive of this case rather than the eight appellate decisions that explicitly found the BSA's record-keeping requirement to satisfy the "public aspect" element under *Grosso*. Indeed, the Seventh Circuit, which decided *Porter*, adopted the Ninth Circuit's analysis in holding that "all three requirements of the Required Records Doctrine are met" with respect to the BSA's record-keeping requirement. *In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d at 909 ("We need not repeat the Ninth Circuit's thorough analysis, determining that records under the Bank Secrecy Act fall within the exception." (citing *In re M.H.*, 648 F.3d 1067)).

Moreover, despite Respondent's statement to the contrary, the Court does find a meaningful distinction between the IRS-taxpayer relationship in *Porter* and the relationship at issue here. In *Porter*, the Seventh Circuit reasoned that, while "26 U.S.C. § 6001 requires the taxpayer to 'keep such records . . . as the [IRS] may from time to time prescribe' . . . the taxpayer is not, as in *Shapiro*, required to keep such records as an ongoing condition of operating his business under a comprehensive government regulatory scheme. The taxpayer-IRS relationship is, instead, a more limited one which creates an imperative for access to records only in rare cases. In short, the taxpayer's substantive activities are not positively 'regulated' by the IRS sufficient to create a *Shapiro*-type interest in unconditional access to those records." 711 F.2d at 1405 (brackets in the original).

Here, however, Respondent is required to keep records regarding his foreign bank accounts as an ongoing condition under the BSA's regulatory scheme. *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d at 352 ("The BSA is an otherwise-valid regulatory scheme that lawfully requires beneficiaries of foreign bank accounts to retain records containing the basic information about their accounts." (citing 31 C.F.R. § 1010.420)). The regulation mandates that records "shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law." 31 C.F.R. § 1010.420. For purposes of the required records exception, the Ninth Circuit noted that "it does not matter whether the production of that information is requested through a subpoena (as in this case and *Shapiro*), a court order (as in *Bouknight*), or the regulation itself (as in [*California v. Byers*, 402 U.S. 424 (1971)])." *In re M.H.*, 648 F.3d at 1077 (citing *Marchetti*, 390 U.S. at 56 n. 14). "Even if § 1010.420 lacked any reporting requirement whatsoever, it would still have public aspects because . . . the documents in question are required to be kept to aid in the enforcement of a valid regulatory scheme." *Id.*; *see also Under Seal*, 737 F.3d at 335, 337 (concluding that the records kept pursuant to 31 C.F.R. § 1010.420 possess public aspects given the Treasury Department's circulation of this data to other government agencies for the purpose of implementing economic, monetary, and regulatory public policies).

Additionally, as the Third, Seventh, and Ninth Circuits have reasoned, the fact that accountholders, like Respondent, voluntarily engage in foreign banking further distinguishes them from general taxpayers. *See In re M.H.*, 648 F.3d at 1078; *In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d at 909;

*Chabot*, 793 F.3d at 348.  Whereas "the decision to become a taxpayer cannot be thought voluntary," *In re M.H.*, 648 F.3d at 1078 (9th Cir. 2011) (quoting *Smith v. Richert*, 35 F.3d at 303 (7th Cir.1994) (internal modifications omitted)), "no one is required to participate in the activity of offshore banking," *id.*  This difference is important because "[t]he voluntary choice to engage in an activity that imposes record-keeping requirements under a valid civil regulatory scheme carries consequences, perhaps the most significant of which, is the possibility that those records might have to be turned over upon demand, notwithstanding any Fifth Amendment privilege." *In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d at 909; *see also Chabot*, 793 F.3d at 348 ("When accountholders such as the [appellants] voluntarily engage in foreign banking, they effectively waive their Fifth Amendment privilege to prevent the government's compelled disclosure of their account records."); *In re M.H.*, 648 F.3d at 1078 (relying on this consent theory in concluding that the appellant's account records satisfied the public aspects prong of the *Grosso* test); *cf. Smith v. Richert*, 35 F.3d 300, 303 (7th Cir. 1994) (holding that production of certain documents necessary to determine personal income tax liability were not within required records exception, because of the obligatory nature of paying taxes).

Accordingly, given the overwhelming precedent in other circuits and Respondent's failure to distinguish those cases from the present action, the Court agrees with Petitioner that the records sought pursuant to 31 C.F.R. § 1010.420 have "public aspects" to satisfy the third and final *Grosso* element under the required records exception.  In sum, because all three *Grosso* elements are met, the Court concludes that the required records

exception applies and that Respondent may not claim his Fifth Amendment act of production privilege to refuse the production of documents in responding to the Summons.

## C.    Testimony Pursuant to the Summons

In addition to the production of documents, the Summons directed Respondent to appear and testify before Agent Styron.  *Petition* [#1] ¶ 5; *Summons* [#1-1] at 4.  Petitioner notes that Respondent "briefly raises concerns about his testimony before the Revenue Agent" in his Response.  *Reply* [#15] at 18 (citing *Response* [#14] at 5).  Petitioner correctly observes, however, that Respondent's arguments appear to be entirely focused on the production of documents and that he fails to elaborate on why he should not testify pursuant to the Summons.  *Id.*  Nevertheless, Petitioner is concerned that, if its agent is deemed to have excused Respondent's appearance "based on a blanket assertion of the Fifth Amendment, the IRS may be found to have waived compliance, thereby rendering the [S]ummons unenforceable."  *Id.* (citing *United States v. Malnik*, 489 F.2d 682 (5th Cir. 1974); *United States v. Lipshy*, 492 F. Supp. 35, 39 (N.D. Tex. 1979)).  Therefore, Petitioner requests that the Court order Respondent to appear before the Revenue Agent and provide testimony.  *Id.*

Petitioner acknowledges that "[a] person summoned to answer questions from an IRS agent is entitled to assert the Fifth Amendment right not to testify against oneself, where appropriate."  *Id.*  However, the Court agrees with Petitioner that a blanket claim of privilege under the Fifth Amendment is not a valid assertion of the privilege in refusing to comply with an IRS summons.  *Id.*; *see United States v. Schmidt*, 816 F.2d 1477, 1481-

82 (10th Cir. 1987) (holding that a "generalized fear of criminal prosecution for a violation of the tax laws is an insufficient basis for asserting a blanket claim of the Fifth Amendment privilege in refusing to [comply with an IRS Summons].").

To assert a valid claim of privilege under the Fifth Amendment in response to an IRS summons, the taxpayer must demonstrate that he has a "'reasonable cause to apprehend danger' upon giving a responsive answer that 'would support a conviction,' or 'would furnish a link in the chain of evidence needed to prosecute' [him] for a violation of the [tax] statutes." *Schmidt*, 816 F.2d at 1481 (emphasis added) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)). "To satisfy this requirement, [the taxpayer] must factually establish that the risks of incrimination resulting from [his] compelled testimonial communications [are] 'substantial and real, not merely trifling or imaginary, hazards of incrimination.'" *Id.* (quoting *Marchetti*, 390 U.S. at 53 (1968)). An individual is "not exonerated from answering merely because he declares that in so doing he would incriminate himself -- his say-so does not of itself establish the hazard of incrimination." *Hoffman*, 341 U.S. at 486.

Here, it is not even clear whether Respondent is attempting to assert his Fifth Amendment privilege with respect to his testimony. Respondent gives no indication that he faces specific threats of incrimination by testifying. His arguments in the Response [#14] appear to exclusively concern the production of documents. Accordingly, to the extent that Petitioner is concerned that it may have waived Respondent's obligation to testify under the Summons, the Court finds that Respondent has not properly asserted the Fifth Amendment as a basis for refusing to give testimony.

## IV. Conclusion

Based on the foregoing, the Court finds that Petitioner has established its prima facie case to enforce the Summons and that Respondent may not claim his Fifth Amendment privilege in refusing to produce documents and testify pursuant to the Summons.  Accordingly,

IT IS HEREBY **RECOMMENDED** that the Petition [#1] be **GRANTED** to enforce the IRS's Summons against Respondent.

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P.  72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  March 19, 2019

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge