IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-mc-00051-MSK-KLM   )
                                       )
UNITED STATES OF AMERICA,              )
                                       )
         Petitioner,                   )
                                       )
v.                                     )
                                       )
RAJARAM K. MATKARI,                    )
                                       )
         Respondent.                   )

**RESPONDENT'S OBJECTIONS TO THE RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

RESPONDENT, through undersigned counsel, timely lodges his objections to the *Recommendation* of the United States Magistrate Judge which was filed in this case on March 19, 2019 [Doc. # 17][1].

1.  Fed.R.Civ.P. 72(b)(2) states, in pertinent part, that: "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations". Here, the original due date for the filing of objections was April 2, 2019. On March 31, 2019, Respondent filed with this Court his Unopposed Motion to Extend the

---

[1] [Doc. # xx] is the convention used by this writer to designate specific papers filed in this case utilizing the Courts' case management/electronic filing system (CM/ECF).

1

Deadline Under Fed.R.Civ.P. 72 for the Filing of Objections to the Magistrate Judge's *Recommendation* [Doc. #18]. This Court granted Respondent's motion to extend on April 1, 2019. [Doc. # 19]. The extended due date for the timely filing of Respondent's objections is therefore now April 23, 2019.

2.  The *Recommendation* urges this Court to grant the IRS's Petition to enforce a certain IRS Summons served upon Respondent on February 27, 2018. In addition to the requirement that Mr. Matkari appear and testify personally, the Summons commands Respondent to produce, among other documents, ". . .any and all records required to be maintained pursuant to 31 C.F.R. § 1010.420 (§ 103.32 prior to March 1, 2011). . .relating to foreign financial accounts that you had/have a financial interest in, or signature authority over, including records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank. . .with whom such account is maintained. . .and the maximum value of each such account during each specified year." [Doc. # 1-1]. The designated tax years for record production appearing in the "Attachment to Rajaram K. Matkari Summons" are initially listed as 2011 through 2014. The body of the Attachment, however, calls for records from "2011 to the present" in every instance.

The *Recommendation* urges this Court to grant the government's Petition to Enforce [Doc. #1]. The Magistrate Judge finds support for enforcement by way of: A) her finding that the facts in this case are indistinguishable from other cases concerning IRS Summons enforcement in the context of the production of foreign bank account records, and B) her agreement with precedent in eight (8) other Circuit Courts of Appeal

2

which all hold that the "required records exception" to the Fifth Amendment's act of production privilege applies to fact patterns similar to Respondent's i.e. production of foreign bank account records under regulations promulgated under the Bank Secrecy Act ("BSA") is required notwithstanding any legitimate act of production privilege claim by Respondent. The *Recommendation* does acknowledge that resolution of this specific issue has no decisional precedent in the Tenth Circuit.

   3. Respondent's objections to the Magistrate Judge's *Recommendation* are identified by way of specific reference to the section, sub-section, page and paragraph numbers appearing in the body of the *Recommendation*, to-wit:

A. **Section I, paragraph one, page 2**, states, in pertinent part, that: ". . .the IRS. . .is attempting to exercise its civil audit power to conduct an investigation for the purpose of determining Respondent's federal income tax liabilities for 2011 through 2014. . . ." Please consider Respondent's objections and observations written in paragraph 3.B. immediately below to apply, equally, to the finding of fact in this paragraph 3.A..

B. **Section III, sub-section A., pages 9 and 10, with second full paragraph beginning on page 9** which states, in pertinent part, that: "[T]he declaration shows that the investigation of Respondent is for a legitimate purpose" followed by (page 10) "[R]espondent makes no argument to rebut Petitioner's prima facie case." While Respondent did not directly argue in his response that IRS's examination activity was being conducted for an impermissible purpose, he did advance the argument that the assigned IRS Revenue Agent, Ms. Styron, works in a civil-side examination group (Special Enforcement Program) that frequently supports IRS-Criminal Investigation in

3

the development of cases with fraud potential, and sometimes participates in parallel civil and criminal investigations. Respondent further argued that Ms. Styron is either working to develop a case for referral to IRS-CI or, in the alternative, is working jointly with an IRS-CI Special Agent on an already existing, but to date undisclosed, criminal investigation targeting Mr. Matkari. For reference, *see* pages 19 through 21 of the Response beginning with the page 19 paragraph which states: "Finally, while no one would misinterpret. . . ."

      IRS Revenue Agents (civil-side employees) are often, simply, well-camouflaged in their case development techniques and, hence, their criminal tax case involvement is not as easily distinguished as, for example, the FBI agent in a blue and yellow "raid" jacket whose focus is obviously criminal. In *United States v. LaSalle National Bank*, 437 U.S. 298, the Supreme Court examined the nature of the IRS investigatory system, and concluded that ". . .Congress has created a law enforcement system in which criminal and civil elements are inherently intertwined". *Id.* At 309. At the same time, it is undeniable that IRS Revenue Agents are prohibited from conducting a criminal investigation under the guise of a civil audit, while representing to the taxpayer that no open criminal investigation exists. *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977). To the extent that a criminal investigation is already underway or a criminal case is being developed, the IRS Summons issued in this case would indeed be for an improper purpose because IRS has affirmatively represented in its Summons affidavit that it is seeking to determine Mr. Matkari's correct tax liabilities and to determine whether to assess certain penalties against him, all civil-side functions within IRS.

C.       **Section III, sub-section B.1, page 12** discusses the first of three tests which aid a court in its decision making with regard to whether an individual must turn over documents to law enforcement, notwithstanding that the very act of turning over such documents may implicate the producing party's Fifth Amendment right against self-incrimination. These tests are the product of a pair of the Supreme Court's decisions. The first decision is *Shapiro v. United States*, 335 U.S. 1 (1948), which established that the operator of a certain wartime-regulated industry was required to turn over business documents to the government notwithstanding their incriminating nature. Such records were found to be "required records". In the second case, *Grosso v. United States*, 390 U.S. 62 (1968), the Supreme Court established three tests which, if met, compel the holder of "required records" to turn those documents over to law enforcement, notwithstanding that the act of producing them may be incriminating in and of itself. The first of the *Grosso* tests is that the scheme under which documents are turned over must be "essentially regulatory" in nature. In analyzing this requirement, the Magistrate Judge recites a passage from *In re M.H.*, 648 F.3d at 1073 which enumerates the criteria for a finding that a foreign bank account recordkeeping requirement was "essentially regulatory": 1. whether the statutory or regulatory requirement involves an area permeated with criminal statutes [here, we have a collection of all of the criminal penalties contemplated by 31 USC § 5322 plus all of the derivative criminal tax sanctions that foreign bank account activity can unearth i.e. Title 26, Subtitle F, Chapter 75, United States Code, plus the 18 USC 1956 and 1957 money laundering statutes, to name just a few]; 2. whether it is aimed at a highly selective group inherently suspect of

criminal activities [nothing could be more "highly selective" than having the financial institution UBS, as it did in *In re M.H.*, identify 250 U.S. taxpayers whom it believes it may have assisted with tax evasion and turning those identities over to the IRS]. For tax year 2014 the total individual income tax returns filed, according to IRS, were 146.80 million in round numbers. *See* https://www.irs.gov/statistics/soi-tax-stats-examination-coverage-individual-income-tax-returns-examined-irs-data-book-table-9b. Reported foreign bank account disclosure form filings (FBARs) were at 1.16 million for 2015 (2014 FBARs were due to be filed in calendar year 2015), producing an FBAR filing rate of .007%. *See* https://www.irs.gov/newsroom/foreign-account-filings-top-1-million-taxpayers-need-to-know-their-filing-requirements. Further, the individual income tax return examination rate by IRS for all 2014 individual tax returns remained below 1%. *See again*, data found behind the first hyperlink in this paragraph. While it has been said that the relevant regulations are "not aimed at a highly selective group inherently suspect of criminal activities", the actual statistics for individual income tax returns filed, the number of FBAR filers within that group, and the IRS examination rate for 2014 Form 1040 filers, all taken together, reveals that IRS <u>is</u> highly selective. Add to this the number of criminal investigations opened in fiscal year 2014 [about 4,300 nationwide— *see* https://www.irs.gov/statistics/soi-tax-stats-criminal-investigation-program-by-status-or-disposition-irs-data-book-table-18], and it is just as accurate to declare that, as a <u>practical</u> matter, the FBAR regulations are indeed aimed at a sub-group inherently suspect of criminal activities as IRS tends to utilize its human resources wisely; and 3. whether complying with the requirement would "***generally***. . .prove a significant link in a chain of

6

evidence tending to establish guilt" [an *ex parte* hearing in this matter would expose several links of the variety contemplated by Fifth Amendment/self-incrimination jurisprudence] (emphasis supplied by this writer).

D.      **Section III, sub-section B.1, pages 13-16:** The *Recommendation* makes much of the decision in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), not only for its declaration that "the fact that a legislative enactment manifests a concern for the enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it", but also for the fact that many later decisions utilized this same passage to decide that the BSA is "essentially regulatory" in nature. The *Recommendation* then proceeds to list additional cases from various circuits that adopt the holding in *Shultz,* and to observe that Respondent fails to address these by distinguishing them from the facts at hand, or to explain why each was wrongly decided.

*Shultz* decided upon the constitutionality of various provisions of the BSA concerning foreign and domestic transactions and facilities. The Supreme Court decided that the various provisions of the Act were constitutional. Here, no challenge is made to the constitutionality of the BSA as was the case in *Shultz*. In this case, the question is only whether any person can validly assert a Fifth Amendment act of production privilege when faced with the prospect of disgorging foreign bank account information to the government. *Shapiro* instructs that, if the records must be kept for inspection and turnover to the government in a highly regulated industry, they are "required records".  *Marchetti* and *Grosso* provide examples of when turnover is successfully shielded by the Fifth Amendment. *Grosso*, in addition, provides a three-

7

pronged test for use when analyzing whether documents are "required records". The first prong of that test is discussed in paragraph 3.C. above i.e. whether the BSA provision requiring the preservation of documents is "essentially regulatory". Many of the remaining circuit decisions simply fall in line with the cases decided before them, and along the way provide a number of examples of issues for decision that could have gone either way. An example is: *In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d at 909 ("We need not repeat the Ninth Circuit's thorough analysis, determining that records under the Bank Secrecy Act fall within the exception." Another example appears in *Chabot*, 793 F.3d at 347 ("An equally important objective of both the [BSA] and § 1010.420, however, is to monitor and facilitate compliance with currency regulation and tax laws. . . .Accordingly, like our sister circuits. . .we find the [appellant's] arguments that § 1010.420 is an essentially criminal scheme to be unpersuasive." In contrast, Justice Douglas's dissenting opinion in *Shultz* begins with: "The Act has as its primary goal the enforcement of the criminal law." Essentially regulatory or another tool to fight crime? Just because it may serve both civil and criminal functions, does not mean that the BSA is for the most part regulatory, nor "essentially regulatory". After all, more new federal bureaus that use the BSA to monitor criminal activity have been created on account of the BSA than not, the primary example being the Financial Crimes Enforcement Network e.g. FinCen. The point is, many of the decisions could have gone the other way. Another example appears in *In re M.H.*, 648 F.3d at 1074 ("Therefore, that Congress aimed to use the BSA as a tool to combat certain criminal activity is insufficient to render the BSA essentially criminal as

opposed to essentially regulatory.") This pronouncement appears to spread the concepts around so evenly that, if one was sitting on the fence, one could go either way and still feel justified in the decision just made.

E.      **Section III, sub-section B.3, pages 22-25:** The *Recommendation* also cites to *United States v. Porter*, 711 F.2d 1397 (7th Cir. 1983), where the government was unable to convince the court that an IRS Summons for standard business records was equivalent to an IRS Summons for foreign bank records. The 7th Circuit ruled that the taxpayer was "not. . .required to keep such records as an ongoing condition of operating his business under a comprehensive government regulatory scheme. The taxpayer-IRS relationship is, instead, a more limited one which creates an imperative for access to records only in rare cases. In short, the taxpayer's substantive activities are not positively 'regulated' by the IRS sufficient to create a *Shapiro*-type interest in unconditional access to those records." 711 F.2d at 1405. The *Recommendation* then goes on point out that there is indeed a meaningful distinction between the "regular" taxpayer required to keep books & records, and a "regular" taxpayer who also has a foreign bank account and is also required to produce those records. There is no meaningful distinction. The taxpayer who fails to produce books and records for a routine IRS examination will be punished—either civilly or criminally, or both—for that failure. In a similar light, the taxpayer who fails to produce both her books and records and foreign bank account records for an IRS examination will be punished—either civilly or criminally, or both—for that failure.

F. **Section III, and the whole of sub-section C., pages 26 and 27**: Respondent's counsel, in the course of drafting the Response made a part of the record in this case was, admittedly, somewhat less than clear about why Mr. Matkari should not be required to appear and personally testify pursuant to the Summons. Indeed, the *Recommendation* so states: "[H]ere, it is not even clear whether Respondent is attempting to assert his Fifth Amendment privilege with respect to his testimony". (*Recommendation*, page 27, last full paragraph).

The great majority of the legal analysis in this case has surrounded the production of documents and little has been said about live testimony. The legal analysis is, of course, separate and apart from the rules surrounding "records". The Fifth Amendment protects a person from being compelled in any criminal case from being a "witness" against him or herself. The privilege afforded by the guarantee against testimonial compulsion provided by the Fifth Amendment not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. *Hoffman v. United States*, 341 U.S. 479, 486-487 (1951).

To be more clear, Respondent will assert his Fifth Amendment privilege with regard to any substantive question that may be asked of him during any live testimony which he may be ordered to give in this case. Accordingly, Mr. Matkari, if compelled to appear and testify, would voluntarily furnish his name, address and Social Security Number. He would thereafter refuse to answer on Fifth Amendment grounds all

10

separate, substantive questions regarding not only any foreign bank accounts which the IRS believes are connected to him and to his tax returns for the tax years under review, but also any separate, substantive questions which may be asked by any IRS interviewer regarding any other substantive matter about which IRS still seeks information at this date.

The Magistrate Judge's citation of *Schmidt* as support for a prohibition against blanket claims of self-incrimination under the Fifth Amendment is justified and proper. Counsel urges this Court, in making its decision regarding appearance and live testimony to also consider, however, that Mr. Matkari will be seventy-nine (79) years old later in 2019. As such, he lives with a list of documented physical ailments that most of the rest of us would prefer to avoid thinking about. On top of all of this, Mr. Matkari is diabetic and this condition adds great pain, discomfort and struggle to the simple, everyday acts of walking, getting up out of a chair, bathing, reading documents, etc.. He sees a physical therapist weekly and various physicians, plus an ophthalmologist and dentist, more often than he would like to admit. He is the daily recipient of a meal service ("Meals on Wheels") for which he pays, and of periodic visits by Larimer County, Colorado Social Services workers (general health and welfare monitoring). Therefore, given the very short list of what Mr. Matkari would divulge during live testimony [his name, address, Social Security Number] and the disclosure herein of his associated advanced-age health challenges, counsel urges the Court to forego ordering Mr. Matkari's live testimony, or to allow counsel to appear in his stead.

WHEREFORE, Mr. Matkari urges the Court to rule that: 1) he has a valid Fifth Amendment "act of production" privilege which serves as his defense to the production of any foreign bank records called for and described in the IRS Summons served upon him February 27, 2018; and 2) he has a valid Fifth Amendment privilege with regard to any and all questions which any IRS interviewer might propound to Mr. Matkari in the course of any live interview conducted during any personal appearance by him pursuant to the IRS Summons.

FURTHER, should the Court decide that any foreign bank account records the subject of review in this case are "required records" for which no act of production privilege is available and therefore must be produced, Respondent respectfully requests that the Court's Order narrow the scope of the February 27, 2018 IRS Summons to require record production in accordance with 31 CFR § 1010.420—that is, that the lookback period for production is five (5) years according to the regulation and, as such, measurement from the date of service of the Summons (February 27, 2018) to a date five years earlier (February 27, 2013) pays respect to the operative rules. Mr. Matkari should not have to produce documents related to any foreign bank or other account for statements or transactions occurring earlier than February 27, 2013. Finally, it is Mr. Matkari's 2011 through 2014 Forms 1040 that are under examination (the earliest two years with no assessment statute extension in place). IRS's Summons begins by making this mirrored listing, but then expands its list of summoned documents to reach far beyond the tax years for which it has initiated official examination activity. IRS has not notified Respondent that his individual income tax returns for any period beyond

2014 have been opened for examination. Any item or issue beyond December 31, 2014, is therefore not the proper subject of Summons enforcement at this time, and Mr. Matkari respectfully requests that the Court's Order in this case limit the scope of the Summons also in this regard.

Respectfully submitted,

Dated: April 23, 2019    by: /s/ Michael F. Arvin
**Michael F. Arvin**
Michael F. Arvin, Attorney, PC
501 South Cherry Street
Suite 1100
Denver, Colorado 80246-1323
Telephone: (303) 629-6640
FAX: (303) 629-6679
E-mail: arvinlawoffices-ecf@arvin-denver.com
Attorney for Respondent

14

## CERTIFICATE OF SERVICE

      I hereby certify that on this 23rd day of April, 2019, I electronically filed the foregoing RESPONDENT'S OBJECTIONS TO THE RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:


rika.valdman@usdoj.gov

Rika Valdman, Trial Attorney
U.S. Dept. of Justice Tax Division
Attorney for Petitioner


                /s/ Michael F. Arvin
                ***Michael F. Arvin***